**No. 24-1243**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THE SATANIC TEMPLE,

*Plaintiff-Appellant,*

v.

RAÚL LABRADOR, in official capacity as
Attorney General of the State of Idaho, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:22-cv-00411-DCN

## APPELLEES' ANSWERING BRIEF

RAÚL R. LABRADOR
ATTORNEY GENERAL

OFFICE OF IDAHO ATTORNEY
GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
michael.zarian@ag.idaho.gov
nathan.downey@ag.idaho.gov

ALAN M. HURST
Solicitor General

MICHAEL A. ZARIAN
Deputy Solicitor General

NATHAN S. DOWNEY
David A. Leroy Fellow

*Counsel for Appellees*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF THE ISSUES ................................................................................2

STATEMENT OF THE CASE ..................................................................................3

   I.   Idaho Chooses to Protect Unborn Life, and Its Laws Take Effect After *Dobbs*.3

   II.  The Satanic Temple Manufactures a Challenge to Idaho's Laws..........................5

   III. The District Court Holds That the Satanic Temple Has No Standing, and That It Fails to State a Claim Anyway ...............................................................7

SUMMARY OF THE ARGUMENT ...........................................................................9

ARGUMENT ......................................................................................................11

   I.   The Satanic Temple Lacks Article III Standing. ....................................11

      A.  The Satanic Temple Lacks Associational Standing. ........................ 12

      B.  The Satanic Temple Has No Standing in Its Own Right. ............................. 18

          1.  Inability to prescribe abortion pills ........................................... 19

          2.  Diversion of resources and frustration of mission ................................. 25

   II.  On the Merits, the Satanic Temple Fails to State a Claim................................... 32

      A.  *Dobbs* Applies................................................................. 32

      B.  The Satanic Temple Has No Takings Claim. .................................... 34

          1.  There is no property right to an abortion. ............................... 35

      C.  Pregnancy Is Not Slavery. ..................................................... 38

      D.  An Exception for Rape Victims Does Not Violate Equal Protection. ........ 43

CONCLUSION ...................................................................................................46

## TABLE OF AUTHORITIES

### CASES

*All. Hippocratic Med. v. FDA,*
2023 WL 2913725 (5th Cir. Apr. 12, 2023) ...................................................21

*Ariz. All. for Retired Ams. v. Hobbs,*
2024 WL 4246721 (9th Cir. Sept. 20, 2024) .......................................10, 26–29

*Arizona v. Yellen,*
34 F.4th 841 (9th Cir. 2022) ...........................................................................23

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.,*
713 F.3d 1187 (9th Cir. 2013) .................................................................. 16, 17

*Atherton v. United States,*
176 F.2d 835 (9th Cir. 1949) ...........................................................................39

*Brokamp v. James,*
66 F.4th 374 (2nd Cir. 2023) ...........................................................................25

*Butler v. Perry,*
240 U.S. 328 (1916) .........................................................................................39

*Cal. Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) ..........................................................................18

*City of L.A. v. Lyons,*
461 U.S. 95 (1983) ...........................................................................................31

*Civil Rights Cases,*
109 U.S. 3 (1883) .............................................................................................38

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................................. 16, 30

*D'Lil v. Best W. Encina Lodge & Suites,*
538 F.3d 1031 (9th Cir. 2008) .........................................................................15

*Draper v. Healey,*
827 F.3d 1 (1st Cir. 2016) ................................................................................17

*Do No Harm v. Pfizer Inc.,*
96 F.4th 106 (2d Cir. 2024) .............................................................................17

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022) ..................................................................................*passim*

*E. Bay Sanctuary Covenant v. Barr,*
964 F.3d 832 (9th Cir. 2020) ...........................................................................26

*Eisenstadt v. Baird*,
405 U.S. 438 (1972) ........................................................................45

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
666 F.3d 1216 (9th Cir. 2012) ......................................................27

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .............................................................10, 27–28

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................13

*Ga. Republican Party v. SEC*,
888 F.3d 1198 (11th Cir. 2018) ....................................................17

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ..................................................................26, 31

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) .........................................................................12

*KMST, LLC v. Cnty of Ada*,
138 Idaho 577, 67 P.3d 56 (2003) ................................................35

*Knick v. Twp. of Scott, Pa.*,
588 U.S. 180 (2019) .......................................................................35

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ......................................................30

*Lawrence v. Texas*,
539 U.S. 558 (2003) .......................................................................45

*Lawson v. Hargett*,
2024 WL 3867526 (M.D. Tenn. Aug. 19, 2024) ...........................28

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ..................................................12, 18

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...........................................................11, 12, 23

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ......................................................20

*McCormack v. Herzog*,
788 F.3d 1017 (9th Cir. 2015) ......................................................25

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ........................................................17

*Moyle v. United States*,
144 S. Ct. 2015 (2024) ................................................................................4

*Murthy v. Missouri*,
144 S. Ct. 1972 (2024) ..............................................................................12

*Nat'l Audubon Soc'y, Inc. v. Davis*,
307 F.3d 835 (9th Cir. 2002) ....................................................................29

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) ........................................................... 17, 18

*N.J. Physicians, Inc. v. President of U.S.*,
653 F.3d 234 (3d Cir. 2011) ......................................................................17

*O'Bannon v. NCAA*,
802 F.3d 1049 (9th Cir. 2015) ..................................................................24

*Orr v. Plumb*,
884 F.3d 923 (9th Cir. 2018) ....................................................................24

*Phillips v. Wash. Legal Found.*,
524 U.S. 156 (1998) ..................................................................................36

*Planned Parenthood Great Nw. v. Idaho*,
171 Idaho 374, 522 P.3d 1132 (2023) ............................................. 3, 4, 36

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992) ..................................................................................33

*Planned Parenthood v. Wasden*,
376 F.3d 908 (9th Cir. 2004) ............................................................. 21, 25

*Raidoo v. Moylan*,
75 F.4th 1115 (9th Cir. 2023) ...................................................................46

*Religious Sisters of Mercy v. Becerra*,
55 F.4th 583 (8th Cir. 2022) .....................................................................17

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002) ..................................................................................43

*Romer v. Evans*,
517 U.S. 620 (1996) ..................................................................................44

*San Diego Cnty. Gun Rts. Comm. v. Reno*,
98 F.3d 1121 (9th Cir. 1996) ....................................................................21

*Satanic Temple, Inc. v. Rokita*,
2023 WL 7016211 (S.D. Ind. Oct. 25, 2023) ............................ 15–17, 25, 31

*Sierra Club v. Jackson,*
    648 F.3d 848 (D.C. Cir. 2011) ...................................................................17

*SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.,*
    40 F.4th 1320 (11th Cir. 2022) ...............................................................21

*Smayda v. United States,*
    352 F.2d 251 (9th Cir. 1966) ...................................................................41

*Smilovits v. First Solar Inc.,*
    119 F. Supp. 3d 978 (D. Ariz. 2015) .......................................................17

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC,*
    713 F.3d 175 (4th Cir. 2013) ...................................................................17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181, 199 (2023) .........................................................................12

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .................................................................9, 12, 15, 16

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ..........................................................................20, 23

*Tenn. Conf. of the NAACP v. Lee,*
    105 F.4th 888 (6th Cir. 2024) .............................................................28, 31

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
    581 U.S. 433 (2017) .................................................................................31

*Tyler v. Hennepin Cnty., Minn.,*
    598 U.S. 631 (2023) .................................................................................36

*United States v. Kozminski,*
    487 U.S. 931 (1988) ..........................................................................11, 38

*Valley Forge Coll. v. Ams. United for the Separation of Church & State,*
    454 U.S. 464 (1982) .................................................................................31

*Ward v. Ryan,*
    623 F.3d 807 (9th Cir. 2010) ...................................................................36

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................................12

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ...................................................................................34, 35

U.S. Const. amend. XIII § 1 ...............................................................................38

Idaho Const. art. I, § 14......................................................................................35

**STATUTES**

18 U.S.C. § 1461 ................................................................................22

50 U.S.C. § 3811 ................................................................................39

Idaho Code § 18-401 ..........................................................................39

Idaho Code § 18-606 ..........................................................................19

Idaho Code § 18-607 ..........................................................................19

Idaho Code § 18-617 .....................................................................22, 23

Idaho Code § 18-622 .......................................................................3, 44

Idaho Code § 18-8802 ..........................................................................3

Idaho Code § 18-8804 .....................................................................3, 44

Idaho Code § 18-8807 ..........................................................................4

Idaho Code § 39-8203 ...................................................................39, 40

Idaho Code § 54-1406A .......................................................................39

Idaho Code § 54-1803 ..........................................................................22

Idaho Code § 54-1804 .....................................................................22, 23

**RULES**

Fed. R. Evid. 702 ...............................................................................18

**OTHER AUTHORITIES**

1 William Blackstone, Commentaries ....................................................40

13A Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Juris.
§ 3531.5 (3d ed.) ..........................................................................22

2001 Idaho Sess. Laws. ......................................................................40

American College of Obstetricians and Gynecologists, *Committee Opinion No. 700:
Methods for estimating the due date*, Obstet. Gynecol. 2017, 129:e150-4 ...........23

Gregory A. Loken, *"Thrownaway" Children and Throwaway Parenthood*,
68 Temp. L. Rev. 1715 (1995) .........................................................40

Kurt T. Lash, *Roe and the Original Meaning of the Thirteenth Amendment*,
21 Geo. J.L. & Pub. Pol'y 131 (2023) ...............................................42

Lanice H. Tanne, *Problems with contraception play big part in unplanned pregnancies, study says*,
British Med. J., May 17, 2008,
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2386600/ .....................14

Pufendorf, Of the Law of Nature and Nations, Book 4, c. 11, § 4 ................................. 40

Stacie Schmerling Perez, *Combating the "Baby Dumping" Epidemic: A Look at Florida's Safe Haven Law*, 33 Nova L. Rev. 245 (2008) ......................................................... 40

St. George Tucker, 2 Blackstone's Commentaries with Notes of Reference, Chapter 14: Of Master and Servant (1803) ................................................................... 43

Steve P. Calandrillo, *Cash for Kidneys? Utilizing Incentives to End America's Organ Shortage*, 13 Geo. Mason L. Rev. 69 (2004) ................................................................... 38

## INTRODUCTION

The Satanic Temple is an organization that venerates Satan and seeks a right to kill unborn children through a "Satanic Abortion Ritual." To pursue this goal, it has founded an abortion clinic in New Mexico to prescribe abortifacients via telehealth appointments and distribute them by mail.

But for purposes of this appeal, it matters more what the Satanic Temple has not done: specifically, it has not demonstrated that Idaho's abortion laws affect it in the slightest. Its clinic is not in Idaho, it has no Idaho patients, and it cannot identify a single Idahoan who wishes to become a patient—which is just as well, because it has no doctors who are licensed to treat Idaho patients. In fact, it has no doctors at all, only nurse practitioners, and an Idaho law (not challenged here) prohibits nurse practitioners from prescribing the drugs the Satanic Temple wants to prescribe.

In truth, the Satanic Temple is fundamentally not a healthcare provider but an activist group, and its most honest standing theory is the one about activism. It alleges that abortion bans in Idaho and other states frustrated its mission of promoting abortion and caused it to divert $100,000 of its own resources to found the clinic and increase abortion access.

Only that theory doesn't work either, because the clinic does not currently provide abortion drugs to Idahoans and admits it will never do so as long as Idaho's abortion laws are in effect—in other words, the only way the Satanic Temple has diverted resources to oppose Idaho's abortion laws is through this lawsuit. That sort of

diversion of resources has never been enough to create standing, and it is certainly not enough now that the Supreme Court has buried the "diversion of resources" theory the Satanic Temple relies on.

Because the Satanic Temple lacks standing, the Court cannot reach the merits. If it did, it could dispose of them in one sentence: "The Satanic Temple's arguments are foreclosed by *Dobbs v. Jackson Women's Health Organization*, where the Supreme Court expressly found that the U.S. Constitution lacks any explicit or implicit right to abortion. 597 U.S. 215, 231 (2022)." None of the Satanic Temple's arguments has any merit on its own—neither its so-called "right to Protected Sex" nor its outlandish theories that pregnancy is slavery and women's bodies are property. Ultimately not one of them amounts to anything more than an attempt to reopen an issue the Supreme Court has already definitively closed.

### STATEMENT OF THE ISSUES

1. Whether the Satanic Temple lacks associational standing because it neither (a) identified an injured member nor (b) established that any of its members would have standing themselves.

2. Whether the Satanic Temple lacks standing in its own right because it could not point to any injury it will suffer itself.

3. Whether the Satanic Temple has successfully circumvented *Dobbs*'s holding that no constitutional provision creates a right to abortion.

## STATEMENT OF THE CASE

### I. Idaho Chooses to Protect Unborn Life, and Its Laws Take Effect After *Dobbs*.

To advance its "legitimate interest[]" in the "respect for and preservation of prenatal life at all stages of development," Idaho has passed several laws limiting the availability of abortion. *Dobbs*, 597 U.S. at 301. Two such laws are at issue here.

First, in 2020, the Idaho legislature passed the Defense of Life Act, which prohibits most abortions but contains exceptions for preserving the life of the mother and for cases of rape or incest. Idaho Code § 18-622(1)–(2). Because the legislature "recogniz[ed] the constitutional impediments presented by *Roe v. Wade*," it provided that the law would go into effect thirty days following a decision by the Supreme Court overturning *Roe. Planned Parenthood Great Nw. v. Idaho*, 171 Idaho 374, 394, 522 P.3d 1132, 1152 (2023).

Second, in 2021, Idaho passed the Fetal Heartbeat Preborn Child Protection Act, which prohibits abortion after a fetal heartbeat can be detected. Idaho Code § 18-8804. The legislature stated its belief that "[t]he life of each human being begins at fertilization," and reiterated that Idaho has "a compelling interest in protecting the life of a preborn child at all stages of its development." *Id.* § 18-8802. Like the Defense of Life Act, the law had an effective date that would be triggered by developments in the case law, and it provided exceptions for medical emergency, rape, or incest. *Planned Parenthood Great Nw.*, 171 Idaho at 395, 522 P.3d at 1153; Idaho Code § 18-8804. The

law also contains a civil cause of action for damages against medical professionals who participate in abortions. Idaho Code § 18-8807.

Then, in June 2022, the Supreme Court's decision in *Dobbs* overturned *Roe*. 597 U.S. at 231. It held that "[t]he Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision." *Id*. It further explained that history and tradition established no such right: "[b]y the time of the adoption of the Fourteenth Amendment, three-quarters of the States had made abortion a crime at any stage during pregnancy, and the remaining States would soon follow." *Id*. at 241.

Both the Defense of Life Act and the Fetal Heartbeat Preborn Children Act took effect shortly after *Dobbs* was decided, and both were immediately challenged in Idaho courts. In 2023, the Idaho Supreme Court upheld the constitutionality of both laws, explaining that "post-*Dobbs*, the state *can* prohibit and regulate abortions pre-viability" and that "neither the federal constitution, nor the Inalienable Rights Clause in the Idaho Constitution protects abortion as a 'fundamental' right." *Planned Parenthood Great Nw.*, 171 Idaho at 453, 522 P.3d at 1211 (emphasis in original).[1]

---

[1] The Defense of Life Act has also been challenged in federal court on federal preemption grounds. *See Moyle v. United States*, 144 S. Ct. 2015 (2024). An appeal from a preliminary injunction in that case is currently pending before this Court, No. 23-35440, and its resolution does not impact this case.

## II.    The Satanic Temple Manufactures a Challenge to Idaho's Laws.

Within months of *Dobbs* being decided, the Satanic Temple sued to challenge Idaho's abortion laws. The Satanic Temple identifies itself as a "religious association" with "over 3,500 members in Idaho." ER-86–87. Whereas the Satanic Temple previously "focused on education and advocacy," it expanded its operations in the wake of *Dobbs* to include having nurse practitioners "prescribe and deliver abortifacients" through telemedicine. Opening Br. at 5. It opened a clinic in New Mexico in February 2023 dedicated to this purpose—a move it admittedly made "[i]n response" to state laws banning abortion after *Dobbs*. ER-90; Opening Br. at 4. The Satanic Temple does not currently prescribe or deliver abortifacients in Idaho, and it currently does not maintain any staff licensed to prescribe medication in Idaho. Opening Br. at 57; ER-69.

The Satanic Temple filed its complaint on September 30, 2022, naming the Attorney General and Governor Brad Little as defendants. ER-116. The complaint sought to enjoin the enforcement of Idaho's abortion prohibitions, claiming that the laws subject women to involuntary servitude in violation of the Thirteenth Amendment, constitute a Taking of a woman's uterus in violation of the Fifth Amendment, and discriminate against women who become pregnant by accident in violation of the Fourteenth Amendment's Equal Protection Clause. Following an amended complaint that swapped in the State and Ada County Prosecutor Jan Bennetts as defendants for Governor Little, the defendants moved to dismiss. *See* ER-90–91.

The Satanic Temple submitted two declarations accompanying its response to the motion to dismiss in an attempt to bolster its claim of standing: one by the Executive Director of the Satanic Temple, testifying under a pseudonym, and one by "Dr. J.D.," a medical doctor also using a pseudonym. The Executive Director's declaration claimed the Satanic Temple has approximately 1,750 female members in Idaho, and that it has spent over $100,000 on its New Mexico–based clinic. ER-67–69. The Executive Director claims it is "highly likely" that its Idahoan members would use its clinic for abortions if it was legally available, but does not identify any specific member who would use the clinic. ER-69.

Although not a statistician, Dr. J.D. relied on a lengthy string of statistics to conclude that 27 Idahoan members of the Satanic Temple would become "Involuntarily Pregnant" over the course of a year. ER-80–81. To get to that number, Dr. J.D. made the following chain of calculations: (1) the Satanic Temple has 1,750 female members in Idaho of child-bearing age—apparently every single one of its estimated female members, *see* ER-67; (2) 115 Idahoan members of The Satanic Temple will become pregnant at some point during the year based on the fertility rate and abortion rate in Idaho in 2021; (3) half of those pregnancies will be unplanned, because one half of all pregnancies in the United States are unplanned; (4) 48 percent of those unplanned pregnancies will be the result of "failure in the use of birth control"; so (5) 27 women will become "Involuntarily Pregnant." ER-80–81. The Satanic Temple argues that all of these members are harmed by Idaho's restrictions on abortion. Opening Br. at 68–69.

### III. The District Court Holds That the Satanic Temple Has No Standing, and That It Fails to State a Claim Anyway.

The district court dismissed all of the Satanic Temple's claims. It started by agreeing with the defendants that the Satanic Temple lacked either associational or organizational standing to bring its challenge to Idaho's abortion laws. ER-13–16, 20. Regarding associational standing, the court concluded based on the "variety [of] hoops" one must jump through using "statistical analysis and probabilities" that "[i]t is not relatively clear that *anyone* who is a member of [the Satanic Temple]—identified or anonymous—has suffered, or will suffer, an injury as a result of Defendants' actions." ER-12–15 (emphasis in original). The court also denied the Satanic Temple standing in its own right because there was no evidence that any of its Idaho members would use its New Mexico clinic to receive abortions—especially when the Satanic Temple does not employ (or have concrete plans to employ) any licensed Idaho doctors who could administer the abortion. ER-15–17.

Even though the Satanic Temple lacked standing, the district court went on to address the merits of the Satanic Temple's causes of action "to provide additional support for dismissal." ER-20. In doing so, it rightly observed that the Satanic Temple's claims are nothing but attempts to circumvent *Dobbs* and re-create a right to abortion through some other constitutional mechanism. ER-22. The court also saw through the Satanic Temple's attempt to frame the case as infringing on rights to engage in sexual

7

activity, when really "[t]he lack of an option for abortion is what gives rise to [the Satanic Temple's] causes of action; not anything having to do with the act of sex." ER-9.

The district court concluded that the Satanic Temple failed to state a claim with respect to any claim. First, the court rejected its claim that Idaho's abortion laws effected a Taking of a woman's uterus under the Fifth Amendment, which it deemed an attempt to create a "right to an abortion . . . vis-à-vis the Takings Clause." ER-22. The court held that nothing in the text, history, or tradition, of the Fifth Amendment would suggest that a uterus could be considered property. ER-21–22. Far from viewing a uterus as protected property for which an abortion regulation would require compensation, the Founding generation largely *criminalized* abortion. ER-21.

Second, the court rejected the Satanic Temple's claim that Idaho's abortion laws subject women to involuntary servitude under the Thirteenth Amendment. "As the whole of humanity understands, pregnancy is a potential, natural, understood, and often expected consequence of having sex," so it is "disingenuous" to argue that "a woman has not 'consented' to getting pregnant" by engaging in sexual activity. ER-23. Moreover, if the Satanic Temple's argument were followed to its logical end, "it could find that any obligations the law imposes on parents for the support and upbringing of a child would constitute involuntary servitude and justify the termination of the child," which is "blatantly absurd." ER-24.

Finally, the district court dismissed the Satanic Temple's claim that Idaho's abortion laws violated the Equal Protection Clause of the Fourteenth Amendment. ER-

25–26. It reasoned that "'involuntarily pregnant women' or 'women who engage in sex just for the pleasure and intimacy it brings' are not a protected class," but that the laws would survive strict scrutiny even if they were protected classes. ER-26. It also shot down the Satanic Temple's attempt to invoke the Equal Protection Clause based on the laws' effect on the "fundamental right" to have "consensual sex." ER-26. The laws in no way prevent anyone from engaging in such activity—they simply regulate abortion, and "there is no fundamental right to abortion under the Idaho constitution or the United States Constitution." ER-25–26.

## SUMMARY OF THE ARGUMENT

The Court lacks jurisdiction because the Satanic Temple lacks standing. It lacks associational standing because the Satanic Temple has failed to identify any harmed member, instead attempting to establish a statistical likelihood that a harmed member might exist. "[S]tatistical probabilities" are categorically not good enough. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009). Even if it were not necessary to identify a specific harmed member by name, the Satanic Temple must still prove that such a member exists, and the chain of calculations it advances is speculative and riddled with logical gaps.

The Satanic Temple lacks standing in its own right too. It alleges that it may be subject to criminal penalties under Idaho's abortion restrictions, but such penalties are (1) entirely speculative, because it is not clear that any Idaho member of the Satanic Temple will seek an abortion from the Satanic Temple's New Mexico clinic, and (2) not

redressable, because independent, unchallenged state laws would still stand in the way of the Satanic Temple providing abortions in Idaho if it obtains the relief it seeks.

Nor can the Satanic Temple invoke a theory of harm based on a frustration of its mission and a diversion of its resources because the Supreme Court has recently foreclosed that theory of standing, causing this Court to deem the entire line of cases on which the Satanic Temple relies overruled. *Ariz. All. for Retired Ams. v. Hobbs*, 2024 WL 4246721, at *4–11 (9th Cir. Sept. 20, 2024) (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–96 (2024)). And even if the theory were still valid, the Satanic Temple's alleged diversion of resources is wholly self-inflicted and can't create standing.

If the Court proceeds to the merits, it will find an attempt to relitigate *Dobbs* and discover a constitutional right to abortion in some other part of the Constitution. But *Dobbs* already put this question to bed: "The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." *Dobbs*, 597 U.S. at 302 (2022). There is no way around that unambiguous holding, and even if *Dobbs* were not dispositive, the Satanic Temple's specific constitutional theories would still fail.

First, the Satanic Temple has no Takings claim. It defines the property right at issue as "the power of a woman to exclude or remove a Prenatal Person from her uterus." Opening Br. at 38. This is simply the right to abortion by another name, and it has never been recognized as a property right by any court—the Satanic Temple does not say otherwise and asks this Court to create that right itself. Even if the alleged property right existed, the Takings Clause would require only damages—not the

injunction that the Satanic Temple requests—and the damages claims would belong to the women whose "property" was taken, not to the Satanic Temple.

Second, the Satanic Temple's Thirteenth Amendment claim fails because pregnancy is not slavery: the Thirteenth Amendment prohibits only "those forms of compulsory labor akin to African slavery which in practical operations would tend to produce like undesirable results." *United States v. Kozminski*, 487 U.S. 931, 942 (1988). If forcing women to care for unborn children were slavery, the same would be true of forcing parents to care for their children after birth. And yet Idaho law expressly requires parents to provide their children with food, clothing, shelter, and medical care; and the Satanic Temple does not deny that law is constitutional.

Finally, the Satanic Temple's Equal Protection claim should be rejected as squarely foreclosed by *Dobbs*. The Satanic Temple's theory is that the Idaho abortion restrictions burden the fundamental right of non-rape-victims to engage in sexual activity without incurring the consequence of becoming pregnant should their birth control fail. But the only way to ensure that right would be to allow abortions. This purported "right to Protected Sex" is therefore no different than a right to abortion, and is not a fundamental right for the same reasons explained in *Dobbs*.

## ARGUMENT

### I. The Satanic Temple Lacks Article III Standing.

To establish Article III standing, a plaintiff must show an injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The

requirements for standing are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). They "help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The Satanic Temple "bears the burden of establishing" the elements of standing. *Lujan*, 504 U.S. at 561. That injury must be "likely, as opposed to merely speculative," *id.* (cleaned up), and must be supported with "competent proof." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010)).

When a plaintiff is an organization, it can satisfy Article III standing in one of two ways. "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth*, 422 U.S. at 511). The Satanic Temple has failed to show either type of standing here.

## A. The Satanic Temple Lacks Associational Standing.

First, the Satanic Temple has failed to meet the requirements for associational standing. To establish associational standing, an organization must show that: (1) one or more of its members qualify themselves for Article III standing; (2) the interests at stake in the case "are germane to the organization's purpose"; and (3) the organization's

claim and relief requested do not require the individual members to participate in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The Satanic Temple can't get past the first element. It relies solely on speculation and off-point statistical probabilities to assert that one of its members will be harmed— exactly what the case law proscribes. The speculative nature of the Satanic Temple's assertion of harm to one of its unknown members is evident at every step of its calculation.

- *First*, its expert assumes that there are 1,750 female members of child-bearing age in Idaho. This number was apparently derived by splitting the total number of members in half, then assuming that *every* female member is of child-bearing age because the organization's members "are generally between 16 and 40 years old." ER-67, 80.

- *Second*, its expert, Dr. J.D., multiplies the total number of members by the 2021 Idaho fertility and abortion rates to conclude that 115 members will be pregnant every year, even though the complaint was filed in 2022. ER-80.

- *Third*, its expert multiplies 115 by the percentage of pregnancies in the United States that are unintended (50%) to presume that 57 members will become pregnant unintentionally each year. Dr. J.D. offers no reason to believe that the national rate is the same in Idaho. ER-81.

- *Fourth*, Dr. J.D. multiples 57 by the rate of unintended pregnancies that are due to "a failure in the use of birth control" (allegedly 48%) to reach 27 annual "Involuntarily Pregnant Women"—i.e., women who became pregnant "without [their] consent due to the failure of her Birth Control." ER-81, 88. A closer look at the source Dr. J.D. cites shows that only 5% of unplanned pregnancies are the result of women who used birth control "correctly but [the contraceptive] failed," while 43% of unplanned pregnancies are the result of "inconsistent[] or incorrect[]" birth control use.[2] Had the 5% number been used at this step of the calculation, Dr. J.D would have concluded that only 3 hypothetical women meet the Complaint's definition of "Involuntarily Pregnant Women."

- *Fifth*, the Satanic Temple presumes that every one of these "Involuntarily Pregnant Women" would want an abortion. It provides no evidence for this conclusion, and simply assumes that all "unplanned" pregnancies are "unwanted." Opening Br. at 60. For example, it does not take into account any circumstantial facts of the theoretical women's pregnancies (like how many of these women might be married).

---

[2] Lanice H. Tanne, *Problems with contraception play big part in unplanned pregnancies, study says,* British Med. J., May 17, 2008, at 1095, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2386600/.

This chain was highly attenuated to begin with, and upon closer scrutiny is riddled with massive gaps in logic and evidence. It does not establish that anyone will be injured, as another court considering this exact same chain of statistics from this exact same expert has concluded. *See Satanic Temple, Inc. v. Rokita*, 2023 WL 7016211 at *6 (S.D. Ind. Oct. 25, 2023) (Dr. J.D.'s "calculated allegations do not inspire confidence").[3]

Moreover, even if the statistical inferences had been more concrete, the Satanic Temple's attempt to establish associational standing by statistical likelihood of a harmed member existing is independently foreclosed by binding precedent requiring that organizations seeking to rely on associational standing advance "specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (emphasis in original) (quoting *Summers*, 555 U.S. at 498). The "requirement of naming the affected members has *never* been dispensed with in light of statistical probabilities." *Id.* (emphasis added). Standing is a bedrock requirement of federal jurisdiction that is "built on separation-of-powers principles,"

---

[3] The Satanic Temple's *annual* projection is also flawed because standing is assessed at the time of filing, so it's irrelevant whether a Satanic Temple member may desire an abortion months or years after the case commenced in September 2022. *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008).

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), and a court exceeds its proper role if it does not *know* that a real person exists with a real claim that the court can hear.

The Supreme Court applied this rule in *Summers v. Earth Island Institute*, where it denied standing to an organization that submitted an affidavit without the names of any harmed individuals. 555 U.S. at 497–99. The Court expressly rejected the dissent's argument that a "statistical probability" would qualify to show a concrete injury, reasoning that the dissent's "novel approach to the law" would result in a "mockery" of its precedent that requires "plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498. And this Court has done likewise—it denied associational standing to an organization that submitted a declaration that did "not identify any affected members by name." *Associated Gen. Contractors*, 713 F.3d at 1194–95.

The Satanic Temple therefore cannot establish standing because it has not identified (even pseudonymously) a single member who would be injured by Idaho's abortion restrictions. The Satanic Temple tries to distinguish *Summers* by arguing that the petitioners there did not present any statistics and calculations, but the Court spoke exactly to this situation when it said that the "requirement of naming the affected members has never been dispensed with in light of statistical probabilities." *Summers*, 555 U.S. at 498–99. Indeed, "[t]he ambiguity inherent in the Satanic Temple's analysis illustrates the exact difficulty" that concerned the Court in *Summers*. *Rokita*, 2023 WL 7016211 at *6.

The Satanic Temple also seeks to avoid *Summers* by pointing to this Court's decision in *National Council of La Raza v. Cegavske*, but to no avail. 800 F.3d 1032 (9th Cir. 2015). For starters, *La Raza* could not overturn *Summers*'s holding or this Court's holding in *Associated General Contractors* that parties lack standing if they do "not identify any members by name." 713 F.3d at 1194–95. So to the extent *La Raza* truly held—contrary to every circuit after *Summers*[4]—that naming a member is not necessary for associational standing, this Court would be bound to follow the Supreme Court and its own prior holding. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).[5]

Fortunately, there is no conflict because *La Raza* is better understood as dicta questioning the wisdom of *Summers* than an attempt to circumvent it. The decision rested on the diversion of resources to the organization itself, and ultimately indicated that it was taking no firm position on how to read *Summers* and directed the district court on remand to allow leave to amend so the organization could identify a member by name. *La Raza,* 800 F.3d at 1041. A concurring opinion from another case has

---

[4] *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 118 (2d Cir. 2024); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011); *see also Rokita*, 2023 WL 7016211 at *6.

[5] *See also Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("when a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail"); *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 991 (D. Ariz. 2015) (same).

opined that perhaps *La Raza* meant to make a special rule for facial challenges to standing where the court presumes that the allegations in the facts are true, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1115 (9th Cir. 2024) (Baker, J., concurring), but that special rule wouldn't apply here where the defendants here have raised a *factual* challenge to standing based on the Satanic Temple's lack of proof. *See Leite*, 749 F.3d at 1121–22; ER-41.

In any event, even on its own terms, *La Raza* opined only that identifying a specific member might not be necessary if "it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action." 800 F.3d at 1041. As explained above, that is not the case here— the allegation that some woman in Idaho has been or will be harmed rests on speculation upon speculation.[6]

### B. The Satanic Temple Has No Standing in Its Own Right.

The Satanic Temple's claim of an organizational injury in its own right fares no better. It advances two theories of injury: (1) an inability to prescribe abortion pills to

---

[6] The Satanic Temple's argument that the district court somehow erred by not holding a *Daubert* hearing is meritless. *See* Opening Br. at 69–72. The court did not exclude or disregard Dr. J.D.'s declaration; rather, it expressly considered the declaration and simply concluded that it was too speculative to establish standing. ER-13. Besides, Dr. J.D. would have failed *Daubert* anyways—Dr. J.D. is a medical doctor with a background in "obstetrics and gynecolog[y]," ER-79, and no superior "knowledge, skill, experience, training, or education" in statistical analysis. Fed. R. Evid. 702.

its members in Idaho, and (2) a diversion of resources and frustration of its mission. Neither comes close to establishing standing.

### 1.     Inability to prescribe abortion pills

The Satanic Temple's lead theory is that it is harmed by the "Idaho Abortion Bans" because it could be subject to criminal prosecution under those laws. Opening Br. at 53–60. The holes in its theory are evident right off the bat—it never articulates a theory of how it (as an organization) will be subject to criminal liability rather than the individuals who actually "perform an abortion" as the challenged laws forbid. *See* Opening Br. at 4 (defining "Idaho Abortion Bans"). Indeed, the Satanic Temple continually ignores this distinction, citing cases about "medical professional[s]" subject to prosecution and discussing criminal penalties that its "staff" (who are not parties to this appeal) might incur. *See* Opening Br. at 53–57.[7] To the extent that the Satanic Temple means to assert an economic injury based on the inability to operate its desired business, it has provided no evidence of any ongoing pocketbook harm either. *See* Opening Br. at 4 n.1 ("[t]he Clinic provides free abortions").

Assuming there is some cognizable interest threatened by the "Idaho Abortion Bans," two key flaws still doom the Satanic Temple's claim to organizational standing.

---

[7] Below, the Satanic Temple suggested that it might be subject to criminal prosecution under laws that prohibit "advertis[ing] . . . anything specially designed to terminate a pregnancy," Idaho Code § 18-607, or some related "accomplice" provision, *id.* § 18-606, but the Satanic Temple has not challenged those laws as unconstitutional.

*First*, the claim to organizational standing fails for the same reason as associational standing—any threat of prosecution is not "actual or imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("the threatened injury" must be "certainly impending" or there must be "a substantial risk that the harm will occur") (cleaned up). The Satanic Temple has stated that it intends to serve its members through its New Mexico clinic, ER-68–69; Opening Br. at 4–6, and, as explained above, the evidence that any Idaho member will become "Involuntarily Pregnant" and then seek an abortion is entirely speculative. In fact, even more speculation is required here than for associational standing—the Idaho member would not only have to choose to obtain an abortion, but would have to choose to do so *through the New Mexico clinic* and not an in-state provider or other telehealth clinic. ER-16. "[W]here a chain of causation involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, . . . the causal chain [is] too weak to support standing." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (cleaned up).

The Satanic Temple has no persuasive response to this point. It argues that it can assert "the rights of prospective patients without specifically identifying them," Opening Br. at 58–59, but the Satanic Temple's organizational standing argument is not attempting to assert the rights of any patients—its argument is that it has suffered its *own* injury impairing its "own right[s]." Opening Br. at 60.

Moreover, the line of cases on which the Satanic Temple relies was overruled in *Dobbs*, which specifically criticized the third-party standing case law that had developed

around the now-overruled right to abortion. *See Dobbs*, 597 U.S. at 286–87 & n.61; *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1328 (11th Cir. 2022) ("to the extent that this Court has distorted legal standards [regarding standing] because of abortion, we can no longer engage in those abortion distortions in the light of a Supreme Court decision instructing us to cease doing so"); *All. Hippocratic Med. v. FDA*, 2023 WL 2913725, at *4 n.4 (5th Cir. Apr. 12, 2023) ("the Supreme Court has disavowed" these theories).

And *Planned Parenthood v. Wasden* does not excuse the Satanic Temple from having to show a real and concrete injury, as it contends. 376 F.3d 908 (9th Cir. 2004); Opening Br. at 59. There, the Court held that an individual doctor with an established abortion practice had standing to challenge a consent requirement for minors, repeating the requirement that the injury be "actual or imminent" and not "speculative." *Id.* at 916–17. Here, however, the Satanic Temple has no established practice or clientele, seeks to offer services only to its members, and plans to provide those services from another state. Those distinctions make all the difference in whether there is any actual or imminent threat of harm.

*Second*, even if there were an established demand for the Satanic Temple's abortion services in Idaho, there would still be no standing because independent, unchallenged provisions of Idaho law would still bar the Satanic Temple's clinic from providing abortions in the State. Those unchallenged laws preclude any showing of traceability or redressability. *See San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121,

1130 (9th Cir. 1996) (no traceability where unchallenged law proscribed same conduct), *abrogated in part on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008).

Federal law independently bars the Satanic Temple from "[d]eliver[ing] Abortifacients to [Satanic Temple] members" in Idaho, as the Satanic Temple hopes to do. ER-68. The Comstock Act prohibits the Satanic Temple from mailing any "article, instrument, substance, drug, medicine, or thing" that produces an "abortion." 18 U.S.C. § 1461. As long as that law is on the books—and it has not been challenged in this case—it is irrelevant whether the "Idaho Abortion Bans" also stand in the way of the Satanic Temple's business plans. 13A Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Juris. § 3531.5 (3d ed.) ("One law alone does not cause the injury if the other law validly outlaws all the same activity.") (collecting cases).

Unchallenged state law poses more independent barriers to redressing the Satanic Temple's alleged injury. The Satanic Temple admits that it does not employ a single doctor licensed to practice medicine in Idaho—in fact, that it does not employ any doctor *at all*, Opening Br. at 5, 57—and Idaho law makes practicing medicine in the state (which includes prescribing medicine) without a medical license a felony. Idaho Code §§ 54-1803(1)(a), 54-1804(3). In fact, state law speaks to the exact medical practice the Satanic Temple would like to engage in—it allows only licensed physicians to prescribe abortifacients. Idaho Code §§ 18-617, 18-604(12). Idaho law also requires an in-person visit with a woman both before and after prescribing her an abortifacient, and the Satanic Temple has never alleged that any hypothetical "Involuntarily Pregnant"

22

member would be willing to travel to New Mexico for such visits. *See* Idaho Code § 18-617(2)–(3); American College of Obstetricians and Gynecologists, *Committee Opinion No. 700: Methods for estimating the due date*, Obstet. Gynecol. 2017, 129:e150-4 (an ultrasound is the standard practice to determine gestational age).

Of these independent barriers, the Satanic Temple addresses only its failure to hire any Idaho-licensed doctors. It argues that it shouldn't be required to do so because it would be futile given the current state of the law. But the Satanic Temple must *at least* establish a concrete "intent to engage" in the proscribed course of conduct beyond a "'some day' intention[]" to do so. *Driehaus*, 573 U.S. at 166 (first quote); *Lujan*, 504 U.S. at 564 (second quote). Just as a plaintiff who "intend[s] to go back to Sri Lanka" but has "no current plans" to do so lacks standing based on environmental harms inflicted abroad, the Satanic Temple's claim that it *could* hire Idaho licensed personnel if needed does "not support a finding of [an] 'actual or imminent injury'" "without any description of concrete plans." *Lujan*, 504 U.S. at 564; *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) ("A concrete plan need not be cast in stone but must be more than a hypothetical intent") (cleaned up).

Nor does the Satanic Temple lay out concrete plans by suggesting that it could pay $300 to license its nurse practitioners in Idaho. *See* ER-69. Nurse practitioners—even if licensed to work as such in Idaho—do not hold a license to *practice medicine* in Idaho. *See* Idaho Code § 54-1804; *see also* Idaho Code § 18-617 (only "physician" may prescribe abortifacients). The Satanic Temple asserts that the FDA's "risk evaluation

23

and mitigation strategy" (REMS) for abortifacients allows nurse practitioners to prescribe abortifacients (even if they are not licensed in the state), Opening Br. at 5, 55–56, but it has not argued (as it did below, ER-16–19) that the REMS preempts state law requiring that the prescriber be an Idaho-licensed physician. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018) (arguments "omitted from the opening brief are deemed forfeited").[8] That requirement therefore still remains an independent barrier to any plan to prescribe abortifacients by licensing nurse practitioners.

The Supreme Court's requirement that a party provide concrete plans is not unreasonable. In a footnote, the Satanic Temple suggests for the first time on appeal that it could "readily use the services of Dr. J.D., who is licensed in Idaho," to satisfy Idaho's requirement that prescriptions be written by licensed doctors. Opening Br. at 57 n.20. This is exactly the type of evidence that the Satanic Temple *could have* attempted to use below to establish concrete plans establishing a real injury. Yet it never did so—in the face of a factual attack on standing, it submitted a declaration from Dr. J.D. that never once mentioned a license to practice in Idaho or any willingness to provide abortion services for the Satanic Temple. It is too late to develop these plans in a brief on appeal. *Orr*, 884 F.3d at 932 ("arguments raised for the first time on appeal . . . are deemed forfeited"); *O'Bannon v. NCAA*, 802 F.3d 1049, 1067 n.11 (9th Cir. 2015)

---

[8] A preemption argument would have been meritless, as the district court explained below. *See* ER-16–19.

(placing "no weight" on party's statement in its brief of its intended course of action for standing purposes because "[s]tatements in appellate briefs are not evidence").

These independent bars to the Satanic Temple's ability to administer abortions distinguish its claim to standing from the licensed doctors in the cases it cites, where the plaintiffs were doctors who were ready and able to provide abortions should the challenged law be enjoined. *McCormack v. Herzog*, 788 F.3d 1017, 1027 (9th Cir. 2015) (doctor with standing was "Idaho licensed physician intending to provide pre-viability medical abortions"), *abrogated by Dobbs*, 597 U.S. at 285 n.58; *Planned Parenthood*, 376 F.3d at 916 (doctor was already "perform[ing] abortions for his patients").[9] This Court should therefore deny organizational standing on this basis, as another court addressing a substantively identical challenge by the Satanic Temple has done. *Rokita*, 2023 WL 7016211, at *10 (rejecting standing because "other unchallenged federal law and Indiana laws . . . would each independently prohibit the Satanic Temple from lawfully operating its mail-order abortion service").

## 2. Diversion of resources and frustration of mission

The Satanic Temple's other theory of standing is that it has been harmed because it has an experienced both "a diversion of its resources and frustration of its mission."

---

[9] The Satanic Temple's cite to *Brokamp v. James* is even further afield. 66 F.4th 374, 388 (2nd Cir. 2023). There, a mental-health counselor was challenging a state licensing requirement *directly*, so there would have been no independent bar to her practicing in the state should she prevail.

Opening Br. at 60–63 (quoting *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844 (9th Cir. 2020)). It alleges that its "core mission" is to promote abortion, and that "the bans on abortion in Idaho and other states" frustrated that goal and caused the Satanic Temple "in response" to spend $100,000 to open the New Mexico clinic when it could have spent that money elsewhere. ER-90; Opening Br. at 60–61.[10]

The Satanic Temple's theory draws from this Court's "conflicting and confusing" precedents "derived" from the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *Ariz. All. for Retired Ams. v. Hobbs*, 2024 WL 4246721, at *4, *6–7 (9th Cir. Sept. 20, 2024). There, an organization aiming to "assist equal access to housing" had to "devote[] significant resources to identify and counteract" apartment owners' practices of providing false information about availability to potential black renters. *Id.* (cleaned up). This Court previously "read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary*, 993 F.3d at 663.

However, this interpretation of *Havens* was repudiated by the Supreme Court just three months ago in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The situation there was an exact parallel of the situation here: religious *pro-life* organizations

---

[10] Though the Satanic Temple frames its opposition to abortion in terms of its "Satanic Tenets," Opening Br. at 60, it does not base its claim to standing on any religious harm.

sued to challenge a *pro-abortion* policy because it "impaired their ability to provide services and achieve their organizational mission[]" of opposing abortion, thereby causing them to "divert [their] resources in response." *Id.* at 394–95 (cleaned up). The Court held that this is not enough to establish standing. *Id.* As the Court explained, if that theory were correct, it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike provided they spend a single dollar opposing those policies." *Id.* at 395.[11]

The Court then explained why *Havens* does not support a "frustration of mission and diversion of resources" theory of organizational standing. It clarified that "*Havens* was an unusual case" that the Court "has been careful not to extend . . . beyond its context." *Alliance for Hippocratic Medicine*, 602 U.S. at 396. The reason the organization in *Havens* had standing was not because its goal of promoting equal housing opportunity had been undermined, but because the organization also provided housing "counseling and referral services," and the defendant's providing false information about apartment availability "directly affected and interfered" with the organization's ability to provide

---

[11] *See also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224–27 (9th Cir. 2012) (Ikuta, J., concurring and dissenting) (offering other criticisms of this theory, including that it often provides standing to organizations that "spen[d] money investigating and addressing the exact problem they were established to address . . . in the exact way they planned to address such problems, [like] education and outreach"); *Ariz. All. for Retired Ams.*, 2024 WL 4246721, at *7 (collecting criticisms).

counseling and referrals—"not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395.

This Court has accordingly held that its precedents espousing "frustration-of-mission and diversion-of-resource theories" are "irreconcilable" with *Alliance for Hippocratic Medicine*, and has deemed those cases "overruled." *Ariz. All. for Retired Ams.*, 2024 WL 4246721, at *4–8. The only other circuit to address the issue since *Alliance for Hippocratic Medicine* has reached that same conclusion. *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) ("the Supreme Court clarified that *Havens*'s 'unusual' facts did not support a categorical rule allowing standing whenever 'an organization diverts its resources in response to a defendant's actions'"); *see also Lawson v. Hargett*, 2024 WL 3867526, at *17 (M.D. Tenn. Aug. 19, 2024) ("the Supreme Court's decision . . . bars the [plaintiff] from establishing an injury for standing purposes based on its diversion of resources").

Applying the law as the Supreme Court has explained it, the Satanic Temple cannot establish standing simply because the "Idaho Abortion Bans" conflict with the Satanic Temple's abortion policy goals and the Satanic Temple has spent money in response to promote abortion. The question is whether Idaho's laws "directly . . . interfered" with the Satanic Temple's "core business activities" of providing education and advocacy regarding abortion. *FDA*, 602 U.S. at 395. They did not—both before and after, the Satanic Temple remains capable of "continu[ing] its core and ongoing business of" educating about and advocating for abortion or other issues. *Ariz. All. for*

*Retired Ams.*, 2024 WL 4246721, at \*10–11 (no standing where new law would simply cause advocacy organization to "spend resources on education in response to the new law"). And to the extent the Satanic Temple alleges interference with its New Mexico clinic's business operations—which commenced *after* the "Idaho Abortion Bans" took effect—that "interference" is speculative and fails for all the reasons described above. *See id.* at \*9 (law must "directly affect [an organization's] *pre-existing* core activities" to create standing) (emphasis added).

Even if the Satanic Temple's theory were viable, its application of the theory here is fundamentally flawed. For starters, its alleged diversion of resources suffers from a fatal causation problem. A party challenging a law has to show "a causal connection between the injury and the challenged statute." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 848 (9th Cir. 2002). But Idaho's passing of laws *prohibiting* most abortions did not reasonably cause the Satanic Temple to spend $100,000 opening a clinic to *provide* abortions. Opening a clinic that is not legally allowed to provide abortions in Idaho— and in fact "does not prescribe Abortifacients to TST members in Idaho," ER-69— does nothing whatsoever to counteract Idaho's abortion laws.

Thus, to the extent the Satanic Temple has been injured by its decision to open a clinic that it knew would not be able to provide services in Idaho, that injury is wholly self-inflicted and insufficient to confer standing. A party "cannot manufacture [an] injury by . . . choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,

624 F.3d 1083, 1088 (9th Cir. 2010). The Satanic Temple was not in the healthcare space when Idaho's laws took effect, and it would have incurred no financial harm if it had continued pursuing solely "education and advocacy." Opening Br. at 61.

The fact that opening the New Mexico clinic does nothing to counteract Idaho's abortion laws shows that it was never opened in response to Idaho's abortion laws in the first place. Rather, the Satanic Temple decided to invest its resources in a clinic that can currently serve states with loose abortion restrictions, knowing it could not serve those with tighter restrictions. ER-68; Opening Brief at 61 (clinic currently serves New Mexico members). Perhaps the Satanic Temple hoped the clinic would one day provide "nationwide" services, ER-68, but the Satanic Temple cannot "manufacture standing" by spending money when no monetary harm would have otherwise befallen it. *Clapper*, 568 U.S. at 422.[12]

Other pitfalls plague the Satanic Temple's theory too. If the clinic is a mere "diversion" of resources required to counteract a problem caused by Idaho's law, would the Satanic Temple close the clinic and revert its spending to education and advocacy if Idaho's laws are enjoined? It does not appear so. ER-68 ("The purpose of the TST

---

[12] The Satanic Temple even struggles to connect its professed injury to *Idaho's* laws, as opposed to other states' laws. It says that the clinic was established in response to "the bans on abortion in Idaho *and other states*," ER-68 (emphasis added), and in response to "providers *throughout the country* [] closing their doors." Opening Br. at 61 (emphasis added). In another case, it has claimed that it opened the clinic "[i]n response" to *Indiana's* abortion restrictions. *See* Appellant's Brief at 3, *Satanic Temple, Inc. v. Rokita*, No. 23-3247, ECF 12 (7th Cir. Jan. 29, 2024).

Clinic is to . . . [p]rescribe mifepristone and misoprostol . . . to pregnant members of TST *nationwide*") (emphasis added).

Relatedly, the Satanic Temple's historical $100,000 expenditure would not be redressed by a prospective injunction of Idaho's abortion laws. *See* ER-102. A "plaintiff must have standing to seek each form of relief requested in the complaint," and past expenditures do "not in [themselves] show a present case or controversy regarding injunctive relief." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (first quote); *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (second quote). But the Satanic Temple has never explained or provided evidence of any future diversion of resources—or other financial harm, like being forced to close the clinic—that would justify a prospective injunction. *See Lee*, 105 F.4th at 903–04 (denying standing on this basis after *Alliance for Hippocratic Medicine*, and distinguishing *Havens*); ER-16 ("whatever happens in Idaho will not make or break the Clinic").

At bottom, the Satanic Temple's "frustration to promoting the Satanic Tenets and the Satanic Abortion Ritual" are nothing more than a "setback to the organization's abstract social interests." *Rokita*, 2023 WL 7016211, at *9 (quoting *Havens Realty Corp.*, 455 U.S. at 379). That "generalized grievance" may suit the "rarified atmosphere of a debating society," but "it does not suffice for standing." *Id.* (quoting *Valley Forge Coll. v. Ams. United for the Separation of Church & State*, 454 U.S. 464, 470, 472 (1982)).

31

## II.    On the Merits, the Satanic Temple Fails to State a Claim.

The Supreme Court could not have been clearer: "The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision." *Dobbs*, 597 U.S. at 231. That statement disposes of the Satanic Temple's claims—or would, if the Court could reach them—and the Satanic Temple's efforts to evade it are uniformly unpersuasive.

Even without *Dobbs*, the Satanic Temple's constitutional theories are wildly erroneous. The Satanic Temple's arguments imply that: (1) Idaho should pay rent for a woman's womb to avoid violating the Fifth Amendment Takings Clause; (2) Idaho's laws make pregnant women slaves to their children; and (3) Idaho violates Fourteenth Amendment Equal Protection by creating an exception for rape victims. The claims not only lack legal legitimacy, but they are also all attempts to circumvent *Dobbs* and create a constitutional right to abortion.

### A. *Dobbs* Applies.

The Satanic Temple attempts to escape *Dobbs* by arguing that abortion is not the right "lens" for this case. Opening Br. at 24. Supposedly, the case is really about the right to engage in sexual intercourse and whether implantation in the uterus "occurs with a woman's consent." Opening Br. at 25–26. But the Satanic Temple is not challenging laws that prohibit sexual activity or mandate the implantation of zygotes; it is challenging Idaho's abortion laws. ER-102. Obviously this case is about abortion. *See,*

*e.g.*, ER-96, ER-98, ER-99 (the Satanic Temple's complaint includes the word "abortion" in the title of every cause of action).

The Satanic Temple seems to argue that it can escape *Dobbs* by claiming a right to abortion only for women who have not consented to pregnancy, but that argument relies on false interpretation of *Dobbs*. *Dobbs* was not decided on a blank slate, with the respondents claiming a right to abortion in all circumstances and the Court rejecting that categorical claim while leaving others open. Rather, *Dobbs* was decided after forty-eight years of abortion jurisprudence in which every imaginable abortion restriction was tested and numerous arguments for and against abortion rights were offered, considered, and sometimes adopted.

Even the Satanic Temple's consent theory was adopted before *Dobbs*. In *Casey*, the Supreme Court imposed a new viability test that relied on the notion that "a woman who fails to act before viability has *consented* to the State's intervention on behalf of the developing child." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 870 (1992) (emphasis added). In other words, *Casey* said that states' ability to prohibit abortion depends on the pregnant woman's consent. *See id.*[13]

And *Casey* is dead. *Dobbs* rejected it root and branch, declaring it an exercise of "raw judicial power" that lacked any basis in constitutional text or history. 597 U.S. at

---

[13] This "consent" justification for *Casey* was noted in Chief Justice Roberts' *Dobbs* concurrence. 597 U.S. at 350.

277. It concluded, "The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and *Casey* arrogated that authority." *Id.* at 302. At no point did *Dobbs* suggest that its holding might be different for women who had not consented to being pregnant.

*Dobbs* gave states wide freedom to prohibit abortion—as the dissent recognized:

> *An abortion restriction*, the majority holds, *is permissible whenever rational*, the lowest level of scrutiny known to the law. And because, as the Court has often stated, protecting fetal life is rational, States will feel free to enact all manner of restrictions. The Mississippi law at issue here bars abortions after the 15th week of pregnancy. Under the majority's ruling, though, another State's law could do so after ten weeks, or five or three or one—or, again, from the moment of fertilization. States have already passed such laws, in anticipation of today's ruling. More will follow. Some States have enacted laws extending to all forms of abortion procedure, including taking medication in one's own home. They have passed laws without any exceptions for when the woman is the victim of rape or incest.

*Dobbs*, 597 U.S. at 360 (Breyer J. dissenting) (emphasis added). Everyone in *Dobbs* understood what the Court was saying—and it was not saying that abortion bans are constitutional if and only if women have consented to pregnancy.

**B. The Satanic Temple Has No Takings Claim.**

The Satanic Temple's first route for circumventing *Dobbs* leads through the Takings Clause, which states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

The first barrier to the Satanic Temple's appeal to the Takings Clause is that it is seeking the wrong remedy. It wants to enjoin Idaho from taking the alleged property at all, *see* ER-91, but the Takings Clause does not prohibit states from taking property—it merely requires "just compensation" afterward. U.S. Const. amend. V. Consequently, the correct remedy for a Takings Clause violation is a suit for damages. *Knick v. Twp. of Scott, Pa.,* 588 U.S. 180, 201 (2019). And when a suit for damages is available, an injunction against the Taking is not available. *Id.*; *see also* Idaho Const. art. I, § 14 (suit for damages is available); *KMST, LLC v. Cnty of Ada*, 138 Idaho 577, 581, 67 P.3d 56, 60 (2003) (recognizing a suit for damages is available). The Satanic Temple seems to recognize this issue when it writes, "Thus, the Takings Clause requires the State to *pay rent* for the forced occupancy of a woman's uterus to incubate a Prenatal Person . . . ." Opening Br. at 34–35 (emphasis added).

Pretend for a moment that sentence is correct—what does it have to do with the Satanic Temple? The Satanic Temple is an organization, not a woman; it does not have a uterus; it has not been forced to carry a pregnancy to term. It cannot even identify one of its members who has been forced to carry a pregnancy to term. Even if a pregnant woman had a claim against Idaho for rent, that claim would belong to the pregnant woman, not to the Satanic Temple, and this lawsuit would still fail.

### 1.    There is no property right to an abortion.

Even ignoring these insuperable barriers, the Satanic Temple has failed to plead a Takings Clause violation because it has failed to identify any constitutionally protected

property interest at stake. *See Ward v. Ryan*, 623 F.3d 807, 810 (9th Cir. 2010) (Takings claim requires "a property interest that is constitutionally protected").

Since "[t]he Takings Clause does not itself define property," courts "draw[] on 'existing rules or understandings' about property rights." *Tyler v. Hennepin Cnty., Minn.*, 598 U.S. 631, 638 (2023) (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)). Such rules and understandings include state law, "'traditional property law principles,'" "historical practice and [the Supreme] Court's precedents." *Id.*

The Satanic Temple defines the property interest at stake as "the power of a woman to exclude or remove a Prenatal Person from her uterus, a physical thing." Opening Br. at 38. But there is only one way to "exclude or remove a Prenatal Person" before viability: an abortion. In other words, the Satanic Temple has defined its property right as the right to an abortion.

The Satanic Temple has not identified any state law, in Idaho or elsewhere, that makes the ability to have an abortion a property right. *Cf. Planned Parenthood Great Nw. v. Idaho*, 171 Idaho 374, 403–04, 522 P.3d 1132, 1161–62 (2023) (Idaho constitution contains no right to abortion). Historical practice did not protect abortion rights as property—abortion was ordinarily criminalized. *Dobbs*, 597 U.S. at 231. And the Satanic Temple has not identified any Supreme Court case or other authority holding that people have a constitutionally protected property right to an abortion. *Cf. id.* (no federal constitutional right to abortion). To the contrary, the Satanic Temple seems to acknowledge that the property right it requests would be completely novel, to be created

for the first time by this Court. Opening Br. at 45 ("TST asks the Court to recognize we are living in the 21st Century and *confer* the imprimatur of 'property' protected by the Takings Clause on the very real power and economic control women have over the uterus . . . .") (emphasis added).

To support this novel sort of property, the Satanic Temple draws an analogy to air rights. Opening Br. at 42–43. Once upon a time, it argues, the right to use the air above property was inseparable from ownership of the property itself. *Id.* But after new technology rendered the air above property more valuable, air rights were recognized as a new sort of property protected by the Takings Clause. *Id.*

It applies the analogy as follows. Once upon a time, "[h]uman reproduction was dimly understood," but now technology gives women "the ability—i.e., the power—to control how, when and by whom her uterus is occupied" and to profit from "gestational surrogacy by total strangers." Opening Br. at 43–44. Because women now have "economic control . . . over the uterus," the Satanic Temple argues, abortion should now be regarded as a property right. Opening Br. at 45.

By a similar analogy, however, the Satanic Temple could easily create a property right in the sale of one's own organs: in the nineteenth century, it was impossible for organs to survive outside the body or to be transplanted into another person; but now people have "economic control" over their kidneys, which should be regarded as a property right. And yet all states prohibit the sale of organs, and no court has held that prohibition to be a Taking of property. *See* Steve P. Calandrillo, *Cash for Kidneys? Utilizing*

*Incentives to End America's Organ Shortage*, 13 Geo. Mason L. Rev. 69, 78 (2004) ("[b]y 1973, every state had adopted a version of the [Uniform Anatomical Gift Act]," which is "interpreted to outlaw" human organ sales).

And a more fundamental problem arises: the Satanic Temple says the right to exclude unborn children from the uterus is property like air rights. In fact, the Satanic Temple believes that Idaho can "*pay rent* for the forced occupancy of a woman's uterus" as it would do if it took other property. Opening Br. at 34–35 (emphasis added).

The Court should reject this argument. Women's bodies are not property.

### C. Pregnancy Is Not Slavery.

In its next attempt to circumvent *Dobbs*, the Satanic Temple appeals to the Thirteenth Amendment. The Amendment provides that "[n]either slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII § 1. The Amendment "abolished slavery" and "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Civil Rights Cases*, 109 U.S. 3, 20 (1883) (first quote); *United States v. Kozminski*, 487 U.S. 931, 942 (1988) (second quote). It applies to "condition[s] of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Kozminski*, 487 U.S. at 952.

However, it does not categorically prohibit governments from requiring people to perform labor, which governments routinely do. Most vividly, it does not prohibit a

draft—despite the Thirteenth Amendment, the federal government is free to require citizens to join the armed forces and obey their orders, on pain of criminal liability. *Atherton v. United States*, 176 F.2d 835, 840 (9th Cir. 1949); 50 U.S.C. § 3811. The Thirteenth Amendment does not ban jury duty. *Butler v. Perry*, 240 U.S. 328, 333 (1916). It does not prohibit states from requiring healthcare workers to remain at their posts if replacements have yet to arrive. *See* Idaho Code § 54-1406A(7)(b)(ii). It does not interfere with common-law duties of care, which may require people to take affirmative steps—i.e., work—to prevent harm to others.

And, of most relevance here, the Thirteenth Amendment does not invalidate laws requiring parents to care for their children. Consequently, it is not enough to argue that Idaho's abortion law requires pregnant women to "provide[] a Prenatal Person with all of the services and labor necessary to bring it to term, including hormones, oxygen, nutrients, antibodies and the physical labor of delivery," Opening Br. at 9–10, because Idaho law already imposes the same sort of obligations on the parents of postnatal children. *See* Idaho Code § 18-401 (requiring parents "to furnish necessary food, clothing, shelter, or medical attendance").

The Satanic Temple does not deny that Idaho's child abandonment law is constitutional. Instead it argues that child abandonment laws are constitutional only because states also have Safe Haven Acts, which allow the mothers of newborns to abandon their children for adoption shortly after birth. *See* Idaho Code § 39-8203.

This argument fails for at least three reasons.

First, Safe Haven Acts are new. Parents' duty to care for their children is ancient, and states began criminalizing child abandonment around 1900, but the first Safe Haven Act was passed in 1999.[14] In Idaho, the Safe Haven Act dates only to 2001. *See* 2001 Idaho Sess. Laws 1252–53. Under the Satanic Temple's argument, child abandonment laws were unconstitutional for an entire century, and somehow no one noticed that they violated the Thirteenth Amendment by making parents slaves to their children.

Second, Safe Haven Acts still require labor by newborns' mothers: even under Idaho's Safe Haven Act, mothers may not simply stop caring for children, but must first take them to "[a] hospital, fire station, law enforcement agency, or medical services provider that is staffed twenty-four (24) hours per day seven (7) days a week, without exception" and has installed a "newborn safety device" for accepting abandoned infants. Idaho Code § 39-8203(2). Finding and visiting such a location is less work than raising the child to adulthood, but it is still work, and the Satanic Temple insists that "[i]nvoluntary servitude for an hour is still involuntary servitude." Opening Br. at 51.

---

[14] *See* 1 William Blackstone, Commentaries *447 ("[t]he duty of parents to provide for the *maintenance* of their children is a principle of natural law . . . [a]nd thus the children . . . have a perfect *right* of receiving maintenance from their parents") (emphasis in original); Pufendorf, Of the Law of Nature and Nations, Book 4, c. 11, § 4 ("[p]arents lie under a perfect obligation to maintain their children"); Gregory A. Loken, *"Throwaway" Children and Throwaway Parenthood*, 68 Temp. L. Rev. 1715, 1716 (1995) ("[t]he laws of many states, typically dating to about 1900, make it a crime for parents to 'abandon' or fail to provide 'necessary' support for their children"); Stacie Schmerling Perez, *Combating the "Baby Dumping" Epidemic: A Look at Florida's Safe Haven Law*, 33 Nova L. Rev. 245, 252–53 (2008) (after "Texas became the first state to officially adopt a Safe Haven Law" in 1999, all 50 states had their own versions by 2008).

And until the work of safe abandonment is complete, mothers are still responsible for their babies' welfare and may be criminally prosecuted if they neglect it.

And third, it is implausible that every woman with a newborn knows about the Safe Haven Act and how to follow it. How many pass the thirty-day deadline for legal abandonment unawares, without ever realizing they had an alternative? Under the Satanic Temple's own arguments, such women have not consented to the obligations of parenthood: the Satanic Temple insists "[t]he law does not permit constructive consent or fictional waiver to override constitutional rights."[15] Opening Br. at 32. Consequently, under the Satanic Temple's arguments, Idaho's child abandonment statute would still be unconstitutional as applied to such women.

Or, in reverse, if the failure to terminate one's parental responsibilities is constructive consent to the obligations of parenthood, then why wouldn't voluntary sexual activity—subject to a known risk of pregnancy—likewise count as consent? This point was among the district court's leading arguments:

> [T]he notion of becoming pregnant after having sex—even protected sex—is not some far-fetched anomaly. As the whole of humanity understands, pregnancy is a potential, natural, understood, and often expected consequence of having sex. So to say a woman has not "consented" to getting pregnant after undertaking an act that is fully capable

---

[15] The Satanic Temple takes this quote from *Smayda v. United States*, 352 F.2d 251, 260 (9th Cir. 1966), *abrogated on other grounds by Katz v. United States*, 389 U.S. 347 (1967). It does not mention it is quoting the dissent.

> of bringing about that exact result is somewhat
> disingenuous.

ER-23 (footnotes omitted).

But all this analogical reasoning merely confirms what the Thirteenth Amendment's original meaning already makes clear: pregnancy is not slavery.

The Thirteenth Amendment's foundation is in the 1787 Northwest Ordinance. The Ordinance, adopted the same year as the United States Constitution, banned slavery in a host of territories and played an important role in the debates surrounding abolition in the ensuing decades. Kurt T. Lash, *Roe and the Original Meaning of the Thirteenth Amendment*, 21 Geo. J.L. & Pub. Pol'y 131, 135–37 (2023). This central role played a part in the Thirteenth Amendment's drafting; in fact, the draft of the Amendment was based on Jefferson's Northwest Ordinance language, albeit restructured. *Id.* at 138–39. When northern Republicans tried to expand the Amendment beyond the specific prohibitions of the Northwest Ordinance, their attempts were quickly rejected. *Id.* at 139–43.

Because of this foundation, it was well understood that the Thirteenth Amendment's scope was limited to what the Northwest Ordinance prohibited: slavery and involuntary servitude. *Id.* at 144. As used in the Northwest Ordinance (and later the Thirteenth Amendment), "slavery" referred to actual chattel slavery, in which one human being was the personal property of another, while "involuntary servitude" referred to a legal category of private master-servant relationship. *Id.* at 144–45; *see* St.

George Tucker, 2 Blackstone's Commentaries with Notes of Reference, Chapter 14: Of Master and Servant (1803) (the master-servant relationship was a "private economical" relationship). Both terms referred to a private economic relationship between master and servant, not a relationship between an individual and the public or state. Therefore, abortion regulations—which create a legal obligation of an individual towards the state—fall outside the Thirteenth Amendment's scope. Lash, supra, at 144–45.

But whatever the precise reach of the Thirteenth Amendment, it is clear no one thought it created a right to abortion. Within a few years of the Thirteenth Amendment, "three-quarters of the States had made abortion a crime at any stage of pregnancy, and the remaining States would soon follow." *Dobbs*, 597 U.S. at 241. And from that time until *Roe v. Wade*, more than a century later, all states restricted abortion to varying degrees and, so far as Idaho can determine, not a single case ever suggested that abortion bans violated the Thirteenth Amendment. And if the generation that passed the Thirteenth Amendment (and the four or five generations afterward) did not believe the Amendment had any implications for abortion, that is powerful evidence that it does not. *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002) (a "universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional") (cleaned up).

### D. An Exception for Rape Victims Does Not Violate Equal Protection.

The Satanic Temple's final attempt to circumvent *Dobbs* invokes the Equal Protection Clause. It challenges Idaho's abortion restrictions because they allow an

exception for women who are the victims of rape. Idaho Code §§ 18-622(2)(b), 18-8804(1). The Satanic Temple wisely does not argue that the exception discriminates on the basis of a protected class by allowing exceptions only for rape victims. *See* ER-24 (noting "the very obvious difference" between rape victims and women who "become pregnant by accident"). Instead, the Satanic Temple's theory is granting an exception for rape victims while denying it for women who became pregnant "by accident" as the result of consensual sex "burdens a fundamental right" of the latter group. ER-100 (first quote); *Romer v. Evans*, 517 U.S. 620, 631 (1996) (second quote).

The problem for the Satanic Temple is that whether a prohibition on abortion burdens a "fundamental right" is the *exact question* that *Dobbs* decided. 597 U.S. at 234–63. While the Satanic Temple's Fifth and Thirteenth Amendment theories attempt to re-create the right to abortion through alternative constitutional means, this theory tries to use the *same* method that *Dobbs* rejected.

The Satanic Temple hopes that disguising the allegedly burdened fundamental right with a new name—the "right to engage in Protected Sex"—will allow it to sneak past *Dobbs*. Opening Br. at 23. Of course, Idaho's abortion restrictions do not prohibit any sexual act. They only limit the availability of abortion. So the Satanic Temple has defined "Protected Sex" as "sex using birth control and solely for the purposes of pleasure and intimacy"—that is, sex without the consequence of becoming pregnant. Opening Br. at 1. But the only way to eliminate the consequence of becoming "pregnant

by accident" through failed birth control is through abortion. The restyled right, then, is transparently just the right to abortion.

In other words, the Satanic Temple cannot avoid the binding effect of *Dobbs*. Even if it could, fundamental rights are those that are "objectively, deeply rooted in this Nation's history and tradition," *Dobbs*, 597 U.S. at 239, so the exact same historical sources cited by *Dobbs* to show that abortion was widely prohibited by the common law, at the Founding, and at the time of the Fourteenth Amendment would similarly preclude the Satanic Temple from establishing a fundamental right to have sex without the natural consequence of becoming pregnant. *See Dobbs*, 597 U.S. at 234–63. The Satanic Temple does not even try to provide any support—through historical evidence or otherwise—to establish the existence of a fundamental right to sex for pleasure without pregnancy. *Dobbs*, 597 U.S. at 239.[16]

All this analysis was laid out by the district court. On appeal, the Satanic Temple offers only a cryptic argument abstractly distinguishing the "effect of a statute on a right" from "the statute's purpose or 'focus.'" Opening Br. at 52 (emphasis omitted).

---

[16] At various points in a meandering discussion about fundamental rights, the Satanic Temple mentions cases creating a fundamental right to use contraceptives or the right to engage in sexual activity, neither of which are prohibited by Idaho's abortion restrictions. Opening Br. at 32 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972), and *Lawrence v. Texas*, 539 U.S. 558, 578 (2003)). As the Supreme Court has made clear, those rights are "inherently different from the right to abortion"—or the supposed right to sex without pregnancy—because they do not "involve[] what is distinctive about abortion: its effect on what *Roe* termed 'potential life.'" *Dobbs*, 597 U.S. at 273, 295 (specifically distinguishing *Eisenstadt* and *Lawrence*).

Whatever the Satanic Temple means by this argument, neither the effect, purpose, nor focus of Idaho's abortion restrictions burdens any fundamental right to Protected Sex because no such fundamental right exists.[17]

Idaho's abortion restrictions do not violate the Equal Protection Clause because "abortion is not a fundamental right, and no suspect class is at play." *Raidoo v. Moylan*, 75 F.4th 1115, 1125 (9th Cir. 2023). The Satanic Temple's claim is merely an attempt to dress the same overruled right to abortion up in new clothes. But it's "the people's representatives—not judges—[that] decide whether to allow, ban, or regulate abortions." *Id.* at 1118. Idaho's rational choice to allow abortion for rape victims, but not those who engaged in consensual sexual activity, must therefore be respected.

## CONCLUSION

The Satanic Temple is seeking a constitutional right to abortion, but the Supreme Court has expressly said that right does not exist. Even if it did, the Satanic Temple would lack standing to enforce it against Idaho.

The district court's judgment should be affirmed.

---

[17] Idaho's abortion restriction and rape exception easily satisfy rational basis, and even strict scrutiny (as the district court held). ER-26 & nn.16–17. The Satanic Temple is sorely wrong that allowing all unintentional pregnancies to be aborted is a "less restrictive alternative" that would achieve the same goals. Opening Br. at 52–53. Obviously, this alternative entails far more loss of unborn life.

Dated: September 20, 2024

Respectfully submitted,

RAÚL R. LABRADOR
ATTORNEY GENERAL

*/s/ Alan Hurst*

ALAN M. HURST
SOLICITOR GENERAL

MICHAEL A. ZARIAN
DEPUTY SOLICITOR GENERAL

NATHAN S. DOWNEY
DAVID H. LEROY FELLOW

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Circuit Case No.: 24-1243

I am the attorney representing Appellees.

**This brief contains 11,274 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

/s/ *Alan Hurst*                           September 20, 2024
Alan Hurst

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.


/s/ *Alan Hurst*                          September 20, 2024
Alan Hurst